Good morning. May it please the Court, Gene Homan on behalf of Tacoma Police Officer Christopher Clark. I would like to reserve three minutes for rebuttal, please. Officer Clark was involved in a shooting in October of 2011. The facts which are material to the excessive force claim against Officer Clark are not in dispute in the record, and yet the District Court committed several errors on summary judgment. The District Court did not undertake. Can you run through your version of the undisputed facts? The facts that are material to the question of excessive force, as emphasized by this Court in Wilkinson, is we must view the facts as perceived by the officer at the moment they fired the weapon. Just give me your, I want to hear your narrative, if that's okay. Officer Clark had positioned his vehicle in the parking lot in a place that was narrow and intended to contain Mr. Orn. As he was sitting in the vehicle with his partner, Officer Rose, Mr. Orn was coming down the parking lot and driving directly at the patrol car, fearing that the car would be rammed. Well, the directly at the patrol car seems to be a disputed fact. For one thing, Mr. Orn, as I understand it, says he wasn't driving directly at the patrol car, and some of the other officers who were present didn't see the, didn't see that he was aimed at the car. We have not got to the point in the event, Your Honor, where the decision, where the imminent threat was presented to the officer and the decision to employ deadly force was applied. But before that, he wasn't driving directly at the car. He actually was, Your Honor, and I think that plaintiff would concede that when the vehicle was positioned in the parking lot, Mr. Orn was driving directly down the aisle of the parking lot towards the patrol car. Officer Clark got out of it. But my understanding is that there was room between two cars and he was aiming for that room between the cars. No, Your Honor, you have the wrong point in the events. Is this, can you see this? Is this, this is ER 535. Is this the diagram that accurately represents the scene? Yes, but the point that I'm describing is prior to this point in time. Right, but this thing here is like a speed bump or something? Correct. Yes, okay, I think I understand. Okay, and so what was happening is as Mr. Orn was driving towards the officer, he exited his patrol car, moved off to his left to a small median to get out of the way. At the same moment that he exited the car, he saw his partner reaching for the door. He believed Officer Rose had exited the patrol car as well. Mr. Orn approached the patrol car. Excuse me, that's what he said, but first of all, he didn't say he saw him reaching for the door. He said he saw him turning towards the door. Turned towards the door, yes. All right, that doesn't make sense. It's not the same as reaching for the door. And second of all, that information, Officer Rose, as I understand it, said emphatically several times that when they spoke about it afterwards, Officer Clark said nothing about trying to, anything that he thought about Officer Rose, that he said he was trying to protect himself. He never said he was trying to protect Officer Rose. So Officer... So, excuse me, therefore, it's at least a debatable fact as to whether he saw Officer Rose doing anything. Your Honor, I would respectfully disagree. Officer Rose testified that they had a conversation and he didn't recall Officer Clark mentioning it. Officer Clark's written statement documenting this event was written and dated on October 19th, 2011. It is in the record at page 299. In his written statement and in his interview with the officer-involved shooting investigators, he expressly indicated he believed Officer Rose had exited the vehicle. So his statement with respect to his belief as to Officer Rose's position was contemporaneous with the events. Can just... Keep going on the back? Yes, because I'm just trying to get the chronology, so... So Officer Clark has exited the vehicle and moved off to the median on the left. There is conflicting testimony as to whether or not Mr. Orn came to a complete stop or simply slowed significantly. Officer Clark, or excuse me, Mr. Orn, then began to pull around the grass median. Believing that he would not be able to come off of that median, Officer Clark moved from the left of the patrol car to the right corner. So where is he? Is he standing behind the bumper here? He is standing, as I'm standing on the podium, at the corner like this. And the car is coming around this way? And the car is coming around this way. Okay, so how is he at risk of getting run over from that position? Because Mr. Orn, as he's pulling over the berm, was intending to go north. Officer Butts backed his car up block that avenue. Mr. Orn then yarded the wheels to the right. The officer is standing right at the corner and the car is coming directly at the corner of his vehicle. I'm looking just... I mean, if you can help me with this diagram. If he's standing behind the bumper, the rear bumper, on the passenger side, this car is going to go past him and he is not going to be... the car is not going to be coming at him. He's protected by his car. He wasn't completely protected because the Orn vehicle was aiming directly at his patrol car where he was standing. And he's trying to move back to get out of the way and the wheels are still turned to the right. And he's now put his left hand out and he's backing away from the car. He's pulled his right hand up and the first three shots that were fired went through the side of the vehicle. The wheels were still... Stop right there. Okay. Because I have this diagram, which is ER 518, which shows, yes, that the very first shot it looks like enters from kind of the back, almost the back side, which suggests that when he fired the first shot, the car had already passed him. Your Honor, the diagram that you're looking at, you will see two hand drawn lines on them. That actually represents the approximate range of the first shot. Plaintiff's expert left the first shot off the diagram. So during his deposition, I had him identify it. Okay. I see those, but they are still fired straight through the passenger side window, meaning the car has obviously cleared your officer. He is directly adjacent to the car and the wheels are still turned to the right. There are parked cars in the area and he's afraid he's... And Your Honor, the law is clear. It's the question becomes whether or not his perception of the imminent danger is reasonable, not whether it's accurate, because a mistaken but reasonable belief that the suspect presents an imminent risk of death or serious bodily harm does give rise to probable cause to support an application of deadly force. I grant you that, but if you are standing behind this car here and this car has already passed you, I don't see how you are at any risk yourself of getting run over. You might be fearful of people downstream. I grant you that, but I don't understand how he can claim with any degree of reasonableness. Because when the officer was standing at the bumper of his car, he's not directly behind the car. He is out far enough so that he can take up a cover position and he's issuing commands to Mr. Orne. Mr. Orne's vehicle struck the patrol car right where Officer Clark had been standing. And all of this happens in a split second. Had been standing but wasn't standing. No, was standing and then he's moving back, Your Honor. Okay. See, all of this in the quiet of this courtroom is easy to piece out, but we have a split second when the car came off the berm. I agree, but we have testimony, maybe it's conflicting, that the car was literally going crawling along at four miles an hour. So the uncontroverted testimony that is relevant to your analysis is defined by the acceleration mark on the pavement. There is, in the record, and it is contained in my brief, if I can find the right page, on page 33. But there were several officers who testified that the car was, I don't think anybody testified that it was going more than a couple miles an hour. And then Officer Clark says that it accelerated just before that, but several other people said it accelerated after the shooting. So let me clarify the record. First off. So what's the page you're looking at there? I'm looking at page 33 of my brief. Of your brief. And I can direct you to the excerpts of record as well if you like. And in fact, the best picture can be found on page 386 of the excerpts of record. So let me clarify the record with respect to what the testimony was. Officer Butts said that as Mr. Orn's vehicle was crawling around the front end of the patrol car, going maybe four miles an hour, different officer gave it a different speed. Officer Rose said that he thought it was going much faster. But here's the part that actually matters. We all agree that what you see on page 386 of the excerpts of record is an acceleration mark on the pavement left by the Orn vehicle. That is, as it leaves the berm, it accelerates enough to break traction and leave a mark on the vehicle. There is an opinion in the record, which is utterly uncontroverted, from an accident reconstructionist who did a crash analysis of this and puts Mr. Orn's speed at that point in time at about 10 or 11 miles per hour. At the time he hits the two cars that are in the parking lot after he's cleared Officer Clark, he's going 22. And at the time he hits the dumpster, he's doing 25. That's page 561. Mr. Hunter's declaration? This contains things like 22, 23 miles an hour on the impact speed to the parked Chevrolet. That's what I was looking at. Let me see. If we do have Mr. Hunter's declaration, it's on page 537 of the record. Can I ask, let's get by the first initial shots. After that, it seems undisputed that he, that Mr. Officer Clark then ran toward the car and shot through the back window. Correct. Six or seven times. Correct. Right. And as to that, he's not claiming any danger to himself. Not to himself. He says that he thought because he saw Officer Rose turn toward the door, that Officer Rose, he didn't see him go out. He didn't see him open the door. He didn't, he thought that Officer Rose, for some reason, was out of the car. Even though he wasn't out of the car, he didn't see him get out of the car. Now, is that reasonable?  Officer Rose testified that he did, in fact, attempt to get out of the car. And as Mr. Orne came around the front end, he had to scramble back in to protect himself. But here's why it's reasonable. Where is that? Yeah. It is going to be on page 109 of the excerpts of record, page 54 of the deposition, beginning on line six. Okay. You're doing a very good job of finding things. Thank you. Officer, Officer Clark's situation is truly no different than what happened in Wilkinson. This court in Wilkinson said. In Wilkinson, the person was out of the car, was known to be out of the car. The issue is whether he was actually run over, but he was definitely out of the car. Correct. But the question, the way the court analyzed it in Wilkinson is, even if he was safe, Officer Torres' belief was reasonable. And all of this goes to the substantive analysis on the excessive force claim. That still leaves us with the qualified immunity. The district court did not engage in any qualified immunity analysis. The Supreme Court has repeatedly said. I mean, you're right about that. I mean, so if we thought there was excessive force, it could be that the right thing to do would be to remand for a qualified immunity analysis. This court engages in a de novo review. Well, that's true. It's true. Nobody has identified any case law which would have deprived Officer Clark of his qualified immunity. The only case that the plaintiff cited was Adam V. Spears, which is so factually inopposite that it isn't even close. Well, OK. So why wouldn't, if we construed the record in the light most favorable to the plaintiff, as we have to do here. Yes, you do. Why couldn't a reasonable jury on that set of facts conclude that, number one, Officer Clark himself was never at risk of getting run over because the car was moving too slowly to pose any real danger to him, given his position. He could just, as you said, take two steps back and he would be fine. OK, so just that would be part one. And then part two is that even after Mr. Oren rounds Officer Clark's vehicle and is now going to try to proceed out of the parking lot, even at that point, he's not driving like a bat out of hell, driving recklessly where he's going to likely endanger anyone who might be downstream. Well, we have to, then you need the context. So in that sense, even if Officer Clark thought Officer Rose had gotten out of the car and was sort of lurking in the area, there wouldn't be any reason to use deadly force to stop Mr. Oren from proceeding. Well, that takes the entire pursuit out of context. The district court, and again, the court's obligated to take the facts in the light most favorable to the plaintiff. That's what I was trying to do. So is my version of the facts incorrect if I construe it in the light most favorable? Sure, because if you put it into context, prior to that point in time, Mr. Oren had already committed several felonies, which did endanger people. Well, in fact, first of all, this all began because he was driving without his lights on. Yes. Bailed to all over. Right. So what we have here is this unrelenting pursuit of somebody who failed to drive with his lights on. I mean, one option was to stop pursuing him. It was, Your Honor, and during the course of this, Mr. Oren committed several felonies. Well, you're saying that, but presumably the prosecutors charged the ones they thought they could prove, and he was acquitted. The police have no control over what the prosecutors charge, and the acquittal is based on a standard that is wholly different from civil. The qualified immunity analysis requires that either the plaintiff or the court identify specific case law, which would leave it beyond doubt that the officer's conduct in this case was unconstitutional. Neither the plaintiff nor the court did so. There is no case law that the defendants have been able to identify, which would have been unquestionably clear. And in Stanton v. Sims, the Supreme Court actually characterized, clearly established as the equivalent of incompetent. If you're saying that the officer was incompetent, then you have to be able to point to case law. None of his actions make any sense, if you credit the plaintiff's version of the facts. If you credit, that's why I wanted you to walk through your version of the events, because if you credit his version, I grant you, of course, maybe he was mistaken, but he would have been reasonable. But the plaintiff's version of the facts is that of being run over, and Mr. Orn is driving so slowly and non-recklessly as not to justify the use of deadly force to kill him from driving through the parking lot. That's the plaintiff's version of the facts. You don't need a case that says, in that scenario, you cannot kill someone to prevent them from leaving a parking lot. But the cases, Your Honor, that have been decided by this circuit and others all suggest that if the officer is in a tight space, has a split second, and a car is driving next to him. I mean, he's only in a tight space because he was in a safe space at one point. He was on this grass on the other side of the car, and then he decided to come over to this side of the car. Why was that? Because it's his obligation to attempt to take Mr. Orn into custody. He believed that Mr. Orn's vehicle was going to get stuck. So he could have been perfectly safe. He could have just stayed where he was. He wouldn't have been able to see Mr. Orn's vehicle because his patrol car was behind. Okay. But that goes back to the fact that he's being, that his obligation seems to be to, in other words, he's putting himself in a position where he, even if he, where he may have to use deadly force to arrest somebody who's known crimes, and I understand you say there were others, but they're not substantiated in any way that I know about, were driving without his lights on and failing to yield. There's testimony in your honor, in the record from Officer Bordel about the deliberate swerving of his vehicle towards Officer Bordel causing Officer Bordel to pull off. There's testimony from Officer Rose that said that Mr. Orn committed the crime of felony eluding when he drove into the oncoming lane to avoid the application of spike strips. There's testimony in the record from Sergeant Morris that talked about the felony reckless driving that occurred when Mr. Orn drove down a closed road. All right, but all of those would have to be known to Officer Clark to be pertinent. Let me go back to another thing. I was looking for, you said that Officer Rose said that he was trying to get out of the car but stopped. All I found so far, maybe there's more, was at that time I was thinking that I was also going to exit the car and the idea being I believe Mr. Orn was already stopped his vehicle and we would do what's known as a high risk or a felony stop on the vehicle. Is that the evidence you're referring to or is there something else? Because that doesn't say he tried to get out of the car. No. On page 109 of the record, page 54 of the excerpts, at the time I kind of braced myself from the impact. From what I could tell, Mr. Orn swerved at what appeared to be the last minute and he went around the front end of our vehicle and as he was coming around the front end of the vehicle, I started to exit again and then he turned his vehicle hard to the east, which would put him roughly parallel to our vehicle right next to my side. So I stopped the vehicle and stopped coming out, fearing he would actually strike the door as I was exiting. He continued past and struck the right rear quarter panel of our vehicle as he went by. Okay and that was before, that was when when Officer Clark was at the rear of the vehicle taking up a position in an attempt to do a felony stop. What do you mean do a felony stop? He had his weapon drawn, he had taken a position of cover, he had his weapon pointed at Mr. Orn's vehicle, he was giving Mr. Orn commands to stop, to exit the vehicle. Mr. Orn testified he heard those commands, he saw the gun. He testified he didn't intend to aim his car at Officer Clark, but he also testified that when Officer Butts moved his vehicle up and blocked his route of exit, he turned his wheels to the up until and including the time the shots were fired. I am out of time. Very helpful. You're very out of time. Good morning, Your Honors. My name is Loren Cochran, one of the attorneys for the plaintiff, in this case, the appellee, Tom Orn. And may it please the court, respectfully, I disagree, as you can imagine, with almost every alleged undisputed material of fact. Well, could you go through what you think the undisputed facts demonstrate? Well, Your Honor, let me just quote Judge Leighton. Well, no, I'd rather hear what you say. Okay, well, as they were presented to Judge Leighton, and I'll just go ahead and read, this is on excerpts of record, page nine. Judge Leighton repeated what the plaintiff had said, which was, in addition to the multiple significant differences between what Officer Clark told investigators versus what others observed in the admissions Clark made to his partner, Donald Rose, the evidence does not support Clark's claims about shooting. I mean, I've read that probably two or three times. Are you just reading from the disc recorded? We've read that, come on. How about if you start with taking the facts from the vantage point of Officer Clark and tell us what you disagree with, what you heard your opponent describe from his vantage point? Okay, Your Honor. I guess I'm confused as to what the role of that would be since the standard is to look at the facts that's in the most that's what she was claiming to do. We have to look at the world through Officer Clark's eyes, not through your client's eyes. No, absolutely. Through Officer Clark's eyes. So you heard her describe what he was seeing and why he thought that what he did was reasonable. So just what is it that you disagree with that factual narrative? Okay, but Your Honor, do you want me to start with the totality of the circumstances, which is what we're supposed to do? So the totality of the circumstances begins far before Officer Clark says that he's either, and Officer Clark's testimony is not that he was right here. He has no idea exactly where he was. When I deposed him, he talked about there being an entire radius around him, and he could not accurately say exactly where he was. The fact of the matter is he was somewhere around the back bumper, but he never says that he peeked his way out. He never makes any claim like that whatsoever. That's just simply inaccurate based on the testimony that he gave me in his deposition. He never said that at any point during the, in any of his declarations or any other part that I'm aware of, and he certainly didn't say that. Okay, but it would be helpful again if you could give us in chronological narrative. Sure. What, from the point, in the evidence most favorable to the Plage of Sins, about what Officer Clark reasonably did. Well, I don't think anything he did was reasonable. All right. But Your Honor, but here's my understanding of it is that there was a direct order that everyone was to stay in their cars. That came from the pursuing sergeant, Sergeant Morris, and or it could have come from Officer Johnson. I'm not exactly sure who. And the relevance of that is? Is that they were, they were, this is a part of the reasonableness of, of what Officer Clark did. So he ignored a direct order. He parked his vehicle so that it was in a roadblock, which was against departmental policy, knowing that it would precipitate some sort of use of deadly force, because if there's a roadblock, God forbid somebody runs the roadblock, then you're putting whoever's in the path. And it appears that there was a way through, or at least Mr. Oren thought there was. Well, he went around the, he went around the vehicle, Your Honor. He went through a grass berm at two to three miles per hour. But at any rate, if I pick back up where I understand Officer Rose to tell his story, he's in a place of safety, as you've suggested. Officer Clark. I'm sorry, Officer Clark. A place of safety being the other, the grass on the other side. On the other side. Correct. So he's over by the mailboxes. Well, actually he's not by the mailbox. He's by the berm where there's a whole bunch of parking off to the side. Let me make perfectly clear. And he could have stayed there. He could have stayed there. He got out before Officer Rose did anything. Officer Rose testified. He didn't wait and look at Officer Rose and see if he was grabbing for his door to get out. He parked that car so that it was perpendicular to the roadway and he got out. He didn't do anything to look for Officer Rose. And that's what Officer Rose testified to in his deposition, was that there was no deliberation when he looked to, when he actually parked the vehicle. So at any rate, he gets out. He has his vehicle already drawn. And remember, TPD went and looked at whether or not this was a pursuit or whether it was a failure to yield. It went back. There's not only the criminal case that we're looking for that looked at these facts, but Tacoma Police Department looked at these facts too and found that there was nothing other than a fail to yield and that it was not done, well, they didn't say one way or another because it wasn't even a pursuit. But the idea that this was a felony stop. Why does it mean it wasn't a pursuit? It clearly was a pursuit. They were like, how many police cars were there? Twenty-two, Your Honor. Yes. Twenty-two followed him. And yet TPD came back and said it was a failure to yield. Okay. Since you've gone back to the pursuit, do you disagree with your opponent's statement that your client was driving recklessly, rammed his car into another car, drove into oncoming traffic? Yes, I do. Just based on the review after the fact. Of course, I wasn't there and I don't know. But what do you have to dispute? I'm sorry. I apologize, Your Honor. Did the police report say that he never got out lane or he never drove into oncoming traffic? Well, there's various testimony, at least with regard to the review that was done after the fact by Tacoma Police Department. This is not the criminal case. But of course, the criminal case tried to bring up the fact that he was eluding police and that was denied by the criminal jury as well. But TPD looked at the facts and their own administrative review did not support the fact that he was driving recklessly or that he clearly was eluding the police. I mean, his activities here are a little hard to understand in the sense that he continued driving for several miles, as I understand it. Well, I don't deny they're hard to understand other than the fact that he, in his mistaken belief, thought that if he got the vehicle back to his wife, who was working an evening shift, that perhaps TPD would not tow the vehicle. They'd go ahead and let his wife take the car. Of course, he knew he was going to go to jail at that point because he was driving without a valid license. But in his mind, he thought, okay, if I get the car back to the apartment complex. But he was eluding the police. I mean, he knew there were, he had to know there were police. Obviously, there were police. He failed to pull over. I managed to elude the spike strips. I mean, how they didn't manage not to stop him after all of this. Yeah. And I think that is a part of the record that he did not drive over spikes. That is, he eluded them by going into a lane where they weren't. Well, he avoided them. I guess I'm having a problem with the eludes. I'll give you avoid, but you avoid spike strips by going around them into some other lane at a minimum. Right. Right. But there was no evidence whatsoever that was brought that he did so in a reckless manner. And in fact, I thought there was some evidence that nobody was coming when he did this. Right. No one felt like the, that what he was doing was a danger to others. So let's go back closer to the time of, to the, they're now at the apartment complex and then what? Okay. So that they're, they're at the apartment complex. The order goes out to all of the officers to stay in your cars, let the dogs get in. In fact, you can hear it throughout the CAD recording, which is, you know, the dispatch that's coming out. They're saying, how did dogs arrest somebody? No, they say, let the dogs get him. So there's an officer who is a canine officer there. Yeah. There's a canine officer. Dr. Dave or officer Dave Johnson is in the pursuit. And the idea was, and they say this knucklehead is going to jail. And that's a reasonable conclusion based on what has happened. So at any rate, that's the command officer Clark, for whatever reason, decides to use his vehicle differently. He's in a position of safety. Mr. Oren drives the opposite way, not towards Dr. or officer Clark at that point, but he goes around the grass berm. And my understanding is that officer Clark leaves the position of safety and then he goes behind his vehicle. He can't testify exactly where he was behind the vehicle. And the idea that it's undisputed fact that he was peeking out is absolutely disputed. But at any rate, he is there. And then officer Butts moves his vehicle as Mr. Orn is going around in his Mitsubishi and Mr. Orn, so that he doesn't run into officer Butts, goes by, he does touch the back bumper of the vehicle. I mean, doesn't officer Orn say that he had his wheels turned to the right? Mr. Orn? Yes. Yeah, he was trying to avoid officer Butts who had moved his vehicle. No, but if he had his wheels turned to the right, then he was at least going more in the direction of officer Clark than in the opposite direction. And he had to be in order to get through that opening. Correct. No, you're right about that, Your Honor. There's no dispute that he was going to head out one way. Officer Butts moved his vehicle. And so that he wouldn't hit officer Butts, he turned the wheels to the right. But there are two material disputes there, which are number one, was he really in the path of Mr. Orn when he was going by? And number two, what was the speed? The city, or officer Clark, excuse me, keeps saying, well, they're acceleration marks. But in his deposition, their expert says acceleration mark only means that the wheel is going forward. It has absolutely no connotation as to how fast a wheel is going. And there's no evidence that the wheel was going any more than one to two, maybe three miles an hour at the time. Acceleration. It's called an acceleration mark, but you're saying it just means the car was going as opposed to not going. Move forward. Yep. All it means is that the traction is moving forward. That's what an acceleration mark is. That's different than a skid mark or a hard acceleration mark, all of the different things that there could be. But at any rate, my understanding is, based on the testimony, again, of officer Rose, who was still in the vehicle, is that the contact that is made with the bumper is so slight that he does not even feel the vehicle move whatsoever. He doesn't have, there's nothing to it so that it couldn't. What does the evidence say from your point of view about where Mr. Oren was when officer Clark went from the grass berm he was on to the back of the car? Mr. Oren was stopped in front of the vehicle. That's the testimony of the officer that was immediately behind Mr. Oren. So he stops, he's not going fast at all. Instantaneously is my understanding. What's that now? Stopped instantaneously, I mean for a very short time. Yeah, for a very short time. He stops the vehicle and then he drives in the opposite direction from where officer Clark is. But when officer Clark, so when he went off in the opposite direction, was officer Clark out of the car at that point? I mean, was he not, he was out of the car, but was he behind the car or was he still on the grass berm? No, still on the grass berm. He leaves the grass berm only after he sees Mr. Oren going the opposite way over the grass berm on the other side. And once he does that, I gather that, did officer, could Mr. Oren have done anything at that point other than go through that narrow area which is close to where the, where the patrol car, or could he have gone somewhere else? As far, well, I suppose he could have. What I'm trying to understand. He could have stopped. Yeah, he could stop, right? Yeah, he could stop. But the fact that he didn't stop and the fact that he was rolling along does not therefore necessarily mean that the use of deadly force is something that. No, but I'm, what I'm trying to understand is whether when officer Clark moved, was he placing himself in more danger in some knowing fashion than he was in before? Officer Clark? Yes. Yes. And, and that was the body positioning recommendation from the use of force review board with the Tacoma police department is, you got to know where to put yourself. And if no officer should leave a place of safety in order to put themselves in a bad position, uh, in a quickly evolving situation. That is simply, he was on the grass berm and he was safe. He shouldn't have gone anywhere, period, regardless of what's happening elsewhere. Correct. If you're in a position of safety, you're outside of your vehicle and you're dealing with a moving vehicle, don't put yourself in a bad position. It's not reasonable to do so. Well, I, I assume that your position would be otherwise, or at least mine would, uh, if Mr. Orm had done something terrible and, uh, arresting him was, you know, critical. Yes. Yeah. I can't deny the fact that, that, you know, there's 34 years of case law that says if there's a threat out there, um, either to the officer or someone else. And we look at, we look at the Graham factors to find out how Mr. Orm, if they were chasing a murderer, it might be. Yeah. Or even in some of the cases that the officer Clark has cited, where an officer has been actually hit, uh, and there is the potential for continued violence or some sort of danger, immediate danger right after. We don't have that in this case. Uh, at least that's a disputed area of fact, officer Clark. Well, I guess it was after that, after officer Clark moved that he did hit two cars a little bit. He did, but that's after he shot in The best testimony is he, that you have the car going by and it's going by at a very slow rate. Then officer Clark, without aiming, because he has to put the, uh, gun above his head, is either walking or running alongside the officer. Clark says he had his hand on the car, but there's no clear evidence of that. And he says it's on the run fright or the right front bumper, which would match up with the fact that the first shots go through the rear passenger window. Couldn't have your hand over there and move the gun at the same time. Um, but at any rate, he shoots Mr. Orne in the spine and Mr. Orne's leg naturally just goes down on the accelerator. And it's at that point. And what about the, the later shots? Well, what is your position about the record on that, as to that? It's undisputed that it's after the car is going away. He's been shot in the spine. His position is because he thought officer Rose was out of the car. And that's a disputed issue of material fact. Well, what's a disputed issue of material fact? Well, whether he thought that or whether he reasonably thought it or whether or what? Whether he thought it at all. Again, he didn't know where officer Rose was. Officer Rose testified that he didn't ask him or say anything when he parked the car and went to the first berm off to the left. Are those shots less important because he was all, I mean, the injury that caused it, his paralysis had already occurred. Well, I would argue that they're not less important. They still hit him and cause. In terms of your damages, for example, I mean, if somebody, I mean, there are cases where somebody thinks, well, the first two shots may have been okay, but after that it was unreasonable. Well, he, uh, he was hit six times. So, you know, I, I'm reticent to say that one shot, you know, that any of those bullets. Nobody really knows is what you're saying. Well, no, he was shot in the first, first three bullets in the spine. I think that's agreed. The first three shots all hit him and then three out of the remainder or. I don't know if the first three shots. In fact, I don't think the first three shots hit him, your honor. I think at least one of them did. And I think both of the experts agree that it came through the rear passenger window, came down and in, it would actually went through the upholstery of. He was, he was hit by some of the original shots. At least one. And then he was shot multiple times in the neck as fine as he went past when he was already passed. That's right. Okay. All right. Thank you very nice. Very much. Your time is up. Thank you. Also your helpful argument really on these kinds of intensely factual cases, it's very helpful to have people who actually know the record. Your honor, you asked how could officer Clark have reasonably felt in danger. I'd like to direct you to the diagram, which is contained on page five 60 of the record. It is part of the accident reconstruction is analysis. It shows the position of Mr. Orange vehicle, both as it approached and as it contacted the patrol car, it is in the bottom right-hand side of the page. It does far better than I ever could with words. Describe why officer Clark reasonably felt that he in danger when Mr. Orange accelerated off the berm. There's one other thing I would like very much to address. If I may, Mr. Cochran just told you that acceleration mark means the car's moving. That's not accurate. And that's not consistent with the record. You will find Mr. Hunter, the accident reconstruction is testimony in the record. It was put into the record by plaintiff's counsel. It is on page 207 of the record, wherein he says an acceleration mark means that it is a weight shift sufficient to cause that tire to break traction and leave a mark. I have no idea what that means. That's a meaningless statement to me. What that means is the car, when it came off that grass berm and the front tires impacted the pavement was under acceleration hard enough, whether that was five miles an hour or 10 miles an hour, hard enough to cause the traction of the tire to break from the road. That means spinning the tires. Yes, basically. Conventional. So let's remember where officer Clark is and how far away. This is a 6,000 pound vehicle, which is literally a car length away and it is under acceleration hard enough to spin the tires and the diagram on page 560 shows you exactly what does it show? I'm sorry. I just, I haven't shown your honor the placement of the orange vehicle in relation to the corner of officer Clark's car, which car is which the red, the red car is orange. The blue car is the patrol car. Okay. And so why does this show conclusively that officer Clark was in danger? Your honor, I'm not saying it shows that he was in actual danger. The question is whether or not his perception of danger was reasonable. Can I just back up for a minute? Sure. Then your time is up. Thank you. Unless one of my colleagues has a question. I'm done. What? I said I'm done. Is your position that officer Clark's actions in going from the safe place he was when he got out of the car and to a place where, where he was at the time the car was moving forward is not pertinent to the discussion? In other words, that we should just be focusing, as I understand your position, it's that you just start with where he was at the point that he perceived himself to be and you don't ask any questions about what he was doing there. I have two answers to that. First off, what plaintiff is basically arguing is he put himself in danger. I don't want to hear what it plays. I'm asking you. I understand. That's the, that's the intimation is by moving from a place of safety to where he was. Police officers put themselves in danger all the time. That's what we pay them to do. Officer Clark. But why isn't there some degree of inquiry about, again, I understand you think he committed a bunch of felonies, but it's never been proven. And it certainly hasn't been proven that officer Clark knew it. So this whole set of events was because a man was driving around without his lights on. The importance of, of, of arresting this guy is at least somewhat lower than if he were chasing a murderer. Does that make any difference as to whether it's fine for him to put himself in danger to and, and, and pull a gun and contemplate the use of force of deadly force? Certainly under the Graham factors, the circumstances make a difference, but the single most important factor is whether or not the suspect presented an imminent risk. If you take a hypothetical officer attempts to pull over somebody for what is a traffic infraction, and then that person pulls a gun, of course, nobody would dispute that the officer would be entitled to shoot. But he was there, but at that point he is there next to the guy with the gun, but this guy was not next to the person with the car and he put himself next to the person with the car. I think this court's analysis in Billington is probably dispositive of the question your honor is asking. Even if an officer makes bad tactical decisions that are negligent and puts himself in danger, that will not change the analysis on the excessive force. But it wasn't only that he put himself in danger, it's that he put himself in a position where he was contemplating the use of deadly force. Why else did he have his gun out? Because he was effecting a felony stop. That is a typical felony stop. I'm sorry, let's do it again. A felony stop is a typical high risk stop procedure. Officers take up a position of cover around a vehicle. Their weapons are drawn. Okay. They give commands to the individuals. And the felony again was? In this case, felony eluding, assault, and there, if you would like me to identify the places in the record for Officer Bortle's testimony with respect. Did Officer Clark know what happened to Officer Bortle? It's all broadcast over the radio your honor. Can I tell you a specific point in the record where Clark says I was aware? I think I'd rather have you. I cannot. Thank you. Thank you very much. Thank you both really for very useful argument in a factually complicated case. Orrin versus city of Tacoma is submitted and we will take a short break. Thank you.
judges: Boggs, Berzon, Watford